IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

COOK INLETKEEPER, et al.,

     Plaintiffs,

vs.

UNITED STATES ARMY CORPS OF
ENGINEERS, et al.,

     Defendants,

and

ALASKA RAILROAD CORPORATION
and
MATANUSKA-SUSITNA BOROUGH,

     Intervenor-Defendants.

Case No. 3:12-cv-0205-RRB

**ORDER**

This matter involves a dispute regarding the impact of the proposed construction and operation of the Port MacKenzie Rail Extension on surrounding wetlands. Plaintiffs[1] argue that the Railroad's functional assessment significantly undervalued the wetlands to be filled and completely failed to account for impacts to adjacent wetlands. They filed a motion seeking summary judgment

---

[1]    Plaintiffs include Cook Inletkeeper, Sierra Club, and Alaska Survival (collectively "Inletkeeper").

ORDER Re: Motions for Summary Judgment - 1
3:12-cv-0205-RRB

on all claims remaining in the Complaint.[2] The Federal Defendants[3] opposed and filed a cross-motion for summary judgment.[4] Intervenor-Defendants Alaska Railroad Corporation ("the Railroad") and Matanuska-Susitna Borough ("MSB") also opposed and filed a cross-motion for summary judgment, and Inletkeeper replied.[5]

Inletkeeper seeks relief under the Clean Water Act ("CWA"), which prohibits the discharge of any pollutant into the navigable waters of the United States without the authorization of a CWA permit.[6] The Corps issues permits for the discharge of dredged or fill material pursuant to the Corps' and U.S. Environmental Protection Agency's ("EPA") Section 404(b)(1) Guidelines ("the Guidelines").[7] The Corps cannot authorize a discharge without "sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with [the section 404(b)(1) Guidelines."[8] Inletkeeper argues that the Corps acted arbitrarily and capriciously in issuing the Section 404 permit in September of 2012.[9]

---

[2]  Docket nos. 106, 107.

[3]  The Federal Defendants include the United States Army Corps of Engineers, as well as individual members of the Corps.

[4]  Docket 115.

[5]  Docket nos. 116, 117, 119, and 121.

[6]  33 U.S.C. § 1311(a).

[7]  33 U.S.C. § 1344; 40 C.F.R. pt. 230.

[8]  *Id.* § 230.12(a)(3)(iv); *see* 33 C.F.R. §§ 320.2(f) and 320.4(a)(1).

[9]  The Standard of review under the Administrative Procedure Act is discussed in detail in the order at Docket 125.

In approving the Railroad's proposal with regard to the discharge of dredged and fill material, Inletkeeper complains that rather than undertaking the analyses required by the regulations, the Corps merely adopted the assertions of the Railroad, which Inletkeeper argues are "unsubstantiated," and failed to meaningfully address strong criticisms by other expert agencies and abundant evidence in the record that undermines the Corps' conclusions.[10] Inletkeeper argues that the Corps' decision was arbitrary and not entitled to deference for a variety of reasons.[11] The Court previously considered Plaintiffs arguments, partially disposed of the summary judgment motions, and requested further briefing on the sole issue of whether the Corps violated the CWA by relying upon a flawed functional assessment of the wetlands in the project area.[12]

Two functional assessments were performed in this case, one in 2008 and the other in 2010. Inletkeeper complains that the 2010 functional assessment, performed by the Railroad and adopted by the Corps, contradicted the overwhelming record evidence indicating the high quality of the project area wetlands.[13] The Final Environmental Impact Statement ("Final EIS") for the proposed construction and operation of the Port MacKenzie Rail Extension acknowledged that the wetlands in the area of the rail line are "very highly functional because they are predominantly intact, undisturbed systems."[14] Inletkeeper argues that the Final EIS and the U.S. Fish and Wildlife Service

---

[10] Docket 107 at 12.

[11] Docket 107 at 13.

[12] Docket 125.

[13] Docket 107 at 21.

[14] AR 3978.

("FWS"), as well as the EPA, all noted the high quality of the wetlands at issue.[15] Contrary to this evidence, the 2010 "functional assessment that the Railroad submitted to the Corps found that just 0.6 acres of the 95.8 acres to be filled are high functioning."[16] The vast majority — 71.8 acres — were deemed "moderate to low functioning."[17] This is dramatically different from the 2008 assessment, also performed by the Railroad, which identified 87-99% of the wetlands as "high functioning."[18] Inletkeeper suggests that the extreme difference was a result of the Railroad's improper exclusion of two critical wetland functions from the 2010 assessment — "water quality" and "wetland plant diversity."[19] By removing these two functions from the analysis, the second functional assessment yielded dramatically lower results, enabling the Railroad to justify filling what was previously deemed "high functioning" wetlands by re-designating them as "moderate" or "low functioning." The FWS opined that these findings did not even "pass the red-face test."[20]

Inletkeeper complains that the Corps failed to give a reasoned explanation for its decision in light of agency criticism.[21] Specifically, the EPA commented that "they do not concur with the assessment of the functional value of the wetlands that would be impacted by the proposed

---

[15] AR 3995, 638, 652.

[16] Docket 107 at 22 (citing AR 94).

[17] *Id.*

[18] *Id.* at 23 (citing AR 3995).

[19] *Id.* at 23 (citing AR 652).

[20] AR 638.

[21] Docket 107 at 28–29 (citing AR 114).

discharges," noting that the Railroad's assessment appears to understate the value of the functional capacity of the impacted wetlands, as compared to other evidence in the record.[22]

In response, the Railroad and MSB suggest that "Plaintiffs have turned the wetlands functional assessment on its head. Where the Corps and [the Railroad] used the functional assessment to *avoid* sensitive wetlands, Plaintiffs hold up the lack of sensitive wetlands in the [proposed] route as evidence that the functional assessment is flawed."[23] The Federal Defendants similarly defend the distinction between the 2008 and 2010 assessments, arguing that the differences "can be attributed to the different purposes of the documents and different uses of vocabulary."[24] They argue that the 2008 assessment compared 75 sites spread out among twelve alternative routes, while the 2010 assessment involved 167 different sites in the vicinity of the *one* proposed route, which was chosen specifically to avoid the highest quality wetlands.[25] They explain that the combined 2008 and 2010 data was used to create detailed wetland maps.[26] But because the traditional "Magee-Hollands" method for evaluating wetlands does not "fit well with Alaska conditions," the method was modified for use in Alaska, resulting in the elimination of certain characteristics from the 2010 analysis.[27]

---

[22] AR 114.

[23] Docket 117 at 19 (emphasis added).

[24] Docket 115 at 31.

[25] Docket 117 at 21; *see also* AR 1976–2681 (Wetland determination forms and site photographs).

[26] *See* AR 1478–81.

[27] *Id.* at 23; Docket 115 at 32-33.

After the first round of briefing, the Court was unable to discern where (or if) the Corps provided any meaningful response to the FWS and EPA concerns regarding the 2010 assessment and the discrepancies between the 2008 and 2010 assessments. Noting that the administrative record spans over 11,000 pages, the Court was unable to see where, in this voluminous record, the agency took a "hard look" at the FWS and EPA objections and comments regarding the 2010 functional assessment. The Court concluded that the Corps' acceptance of the Railroad's scientific wetlands functional assessment did not appear, based on the briefing provided, to be a reasonable exercise of the agency's scientific and technical expertise. Defendants/ Intervenor-Defendants were directed to file additional briefing and *cite to the record* showing where the Corps addressed the concerns of the FWS and EPA regarding the 2010 assessment in more than a cursory manner.[28] Additional briefing has been filed by the parties. [29]

The Intervenor-Defendants explain in their supplemental briefing how the differences between the 2008 and 2010 functional assessments are reconciled in the record.[30] Although counterintuitive, they suggest that the actual assessment of wetland functional capacity in 2008 is identical to the 2010 findings. The difference "actually lies in the translation of the Magee-Hollands

---

[28] Docket 125.

[29] Docket nos. 126, 127 & 128. The Federal Defendants cite to their prior briefing, which "explains in detail the process by which the 2010 functional assessment was developed, and the Corps' extensive efforts to coordinate with other federal agencies." Docket 126 at 2, *citing* Docket 115 at 29-31. "The Corps is not aware of any additional record evidence specifically regarding the functional assessment issue." *Id.* at 3.

[30] Docket 127 at 10–11.

and GIS data into the four functional categories created by RGL 09-01."[31] They explain that the Magee-Hollands analysis was designed for non-tidal wetlands in New England, rather than Alaskan terrain which has seasonal flooding and more divergent wetland types. Removal of two functions — modification of water quality and wetland plant diversity — was necessary because "these functions had the same value for virtually every wetland type, hydrogeomorphic classification and landform position."[32] The argument is that inclusion of those functions in the original analysis yielded inaccurately *high* results in 2008.

With respect to the questions posed by EPA and FWS, the Intervenor-Defendants suggest that the explanation may be found at AR 849-50. Subsequent to that explanation, the EPA had no further questions. The FWS asked further questions, (AR 520), which were answered at AR 422. The FWS expressed no further concern, even though the Corps continued to update both the EPA and FWS on the project.[33]

The "court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law . . . ."[34] When reviewing "under the arbitrary and capricious

---

[31] *Id.* The "GIS" is the Geographic Information System used for preliminary mapping. AR 2881. "RGL 09-01" refers to the Alaska District's Regulatory Guidance Letter, which addresses how to provide compensatory mitigation for unavoidable impacts to the nation's wetlands and streams resulting from authorized activities.

[32] Docket 127 at 11 (citing AR 839).

[33] *See* AR 236.

[34] 5 U.S.C. § 706(2)(A), (C), (D).

standard[,]" a court is deferential to the agency involved.[35] The agency's action is to be "presum[ed] . . . valid."[36] A court should:

> not vacate an agency's decision unless it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[37]

If an agency has not committed one of the these errors, and "'a reasonable basis exists for its decision[,]'" the action should be affirmed.[38]

The Court has reviewed the comments and responses at AR 421–26, as well as the Supplemental Wetland Functional Assessment Information at AR 847–50. The responses to the comments posed by FWS and the EPA are clear and comprehensive, and the method for combining the assessment methods (Magee-Hollands and GIS), as well as the reasons for doing so, are explained in detail. These documents satisfy the Court's concerns. Once a court is "satisfied that an agency's exercise of discretion is truly informed," a court "'must defer to th[at] informed discretion.'"[39] Accordingly, the Court defers to the agency in this matter.

---

[35] *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007).

[36] *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir. 2011) (quoting *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)).

[37] *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43).

[38] *Cal. Wilderness Coal.*, 631 F.3d at 1084 (quoting *Nw. Ecosystem Alliance*, 475 F.3d at 1140).

[39] *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1331-32 (9th Cir. 1992) (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989)).

## **Conclusion**

In light of the foregoing, summary judgment is GRANTED in favor of all Defendants with respect to the remaining claims.

**IT IS SO ORDERED** this 27th day of May, 2014.

S/RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE